**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

```
                                    )
SIMOR L. MOSKOWITZ,                 )
                                    )
              Plaintiff,            )        Case No. 1:15-cv-336
                                    )
       v.                           )        Hon. Liam O'Grady
                                    )
JACOBSON HOLMAN, PLLC,              )
                                    )
              Defendant.            )
                                    )
```

## MEMORANDUM OPINION

This suit arises out of Simor Moskowitz's departure from his long-time law firm, Jacobson Holman, PLLC (the "Firm"). Central to this dispute is the Firm's valuation of Moskowitz's equity interest in the Firm as of the date of his withdrawal. Moskowitz believes the Firm did not pay him the full value of his equity interest, while the Firm believes it overpaid Moskowitz. Moskowitz sued for breach of contract, and the Firm counterclaimed for declaratory relief and monies owed. Pending before the Court are the parties cross-motions for partial summary judgment. For the reasons stated herein, each motion is granted in part and denied in part.

## I. BACKGROUND

A.    The Firm's Governing Documents

Jacobson Holman, PLLC is a Washington, D.C.-based law firm specializing in intellectual property law. Three of the Firm's governing documents are relevant to this suit: a 1989 Partnership Agreement, a 1996 Operating Agreement, and a 1997 Amendment to the Operating Agreement.

1

Paragraph 24(A) of the Partnership Agreement provides that withdrawing partners are due the amount in their Accrual Basis Account ("ABA"). In full, it provides:

24.     Payment Upon Withdrawal of a Partner

A.     The value of the Partnership Interest of any Partner who shall have withdrawn from the Partnership shall be equal to the Accrual Basis Account of such Partner as of the end of the fiscal year immediately preceding the effective date of withdrawal, adjusted for Net Profits (and Losses) and Accrual Basis Profits (or Losses) allocable to such Partner up to date of withdrawal. Such adjustment to the Accrual Basis Account shall be made by agreement between the withdrawing Partner and the remaining Partners or, in the absence of agreement, by applying the allocation percentage for the withdrawing Partner of Net Profits determined based on the average allocation percentage to such Partner of Net Profits for the last two fiscal year-ends immediately preceding such withdrawal. The adjusted Accrual Basis Account of a Partner at date of withdrawal shall be established by the accountants regularly employed by the Partnership as soon as practicable after the effective date of such withdrawal and shall be conclusive and binding upon all Partners hereto. In establishing such adjusted Accrual Basis Account, the accountant shall include a reduction for doubtful accounts, based upon prior experience of the Partnership.

Def.'s Mtn. Summ. J., Ex. DX1 at 16; Moskowitz Decl., Ex. H at 15. Paragraph 24(B) provides that the withdrawing member's ABA will be paid in ten equal semi-annual installments. Def.'s Mtn. Summ. J., Ex. DX1 at 17; Moskowitz Decl., Ex. H at 16.

In 1996, the Firm converted from a partnership to a limited liability company and adopted the Operating Agreement. Def.'s SUMF ¶¶ 3–4; Pl.'s SUMF ¶ 9. The Operating Agreement incorporated by reference substantially all of the Partnership Agreement "except to the extent that any provision of the Partnership Agreement is inconsistent with . . . [the Operating Agreement]." Moskowitz Decl., Ex. G at 2; Def.'s SUMF ¶ 5; Pl.'s SUMF ¶ 10. Of the provisions specifically adopted was that governing "the withdrawal or retirement of Equity Members." Moskowitz Decl., Ex. G at 2; Def.'s SUMF ¶ 5; Pl.'s SUMF ¶ 10.

In 1997, following the Firm's execution of a new lease agreement, the Firm adopted an Amendment to the Operating Agreement (the "1997 Amendment"). The amendment was to

2

memorialize that "the new lease was entered into by the Company with the understanding by the Equity Members that the financial interests of a withdrawing Equity Member would be modified as set forth below." Def.'s Mtn. Summ. J., Ex. DX3 at 1; Moskowitz Decl., Ex. I at 1; Def.'s SUMF ¶ 6. The amendment consists of three paragraphs.

Paragraph 1 is a forfeiture provision that subjects withdrawing equity members to a fifty-percent reduction in their ABA if they take one or more clients. In full, that paragraph provides:

> 1.      In the event an Equity Member withdraws from the Company at any time after the date of this Amendment [November 18, 1997] and takes client(s) of the Company, and the Company does not dissolve within three months of the Equity Member withdrawal date, then the withdrawing Equity Member will forfeit and give up to the Company fifty percent (50%) of his/her Accrual Basis Account adjusted as of the date of withdrawal (hereinafter the "Forfeited Amount"); provided, however, that the Forfeited Amount shall not exceed an amount equal to twice the percentage financial interest of the withdrawing Equity Member at the time of withdrawal multiplied by the projected base rent of the Company for the year following the withdrawal date. The Forfeited Amount will be first charged against accrual capital and then against cash capital if the accrual capital is insufficient.    This forfeiture, however, will not be made to any withdrawing Equity member who withdraws within three months of Company decision(s) to reduce that Equity Member's allocation of net profits and accrual basis profits without his/her agreement by more than ten percent (10%) of the Equity Member's allocation during the preceding eighteen (18) months, except for a pro rata reduction occasioned by a new Equity Member.

Def.'s Mtn. Summ. J., Ex. DX3 at 1–2. Paragraph 2 establishes that the Firm "shall have the absolute right" to pay a withdrawing member by assigning accounts receivable for which the member is the responsible attorney. *Id.* at 2.

Paragraph 3 addresses the calculation of the ABA. It states:

> 3.      Unless the Company dissolves within three months of an Equity Member Withdrawal date, the adjusted Accrual Basis Account (including the respective amounts attributed to accrual capital and cash capital) of an Equity Member who shall have withdrawn from the Company shall be that amount set forth in the last financial statement for the Company prepared by the Company's accountant, or the last monthly financial statement for the Company prepared by the Company's regularly employed bookkeeper, whichever is later, prior to the date of the withdrawing Equity Member's notice of withdrawal, with adjustments

3

to the withdrawal date solely for events occurring in the period between the closing date of such last financial statement and the withdrawal date; provided, however, that there shall be no adjustment to the withdrawing Equity Member's Accrual Basis Account with respect to any payments for rent due under the new lease after the Equity Member withdrawal date.

*Id.* at 2–3.

B.   Moskowitz's Withdrawal from the Firm

Moskowitz was an equity member of Jacobson Holman (and its predecessor firms) for more than forty years. Def.'s SUMF ¶ 1. He was a party to all of the agreements discussed above. In the spring of 2013, the Firm's eight equity members were facing a July 31 expiration date on the Firm's lease agreement with Jenifer Building Associates ("JBA") for its D.C. office space. Jacobson and Holman, the Firm's name partners, hold "a substantial interest" in JBA. Def.'s Mtn. Summ. J., Ex. DX30 at 10; Moskowitz Decl., Ex. L at 10; Jacobson Decl. ¶ 16 (stating Jacobson is a general partner of JBA).

In March 2013, Jacobson and Holman sent a memo to the Firm's other equity members proposing dissolution of the current firm and the creation of a new firm. Moskowitz Decl., Ex. B. The memo advised that due to "the shortness of time [before the lease expiration], we will assume that any equity member who does not commit within 30 days to go forward with the New Firm will seek a position elsewhere." *Id.* Attached to the memo was a proposed "New Firm Structure." *Id.* On June 11, Jacobson sent a letter on JBA letterhead to the Firm's equity members providing notice that because the Firm had not exercised its renewal option, the Firm must vacate on or before July 31. Moskowitz Decl., Ex. A.

On June 28, Moskowitz provided written notice of his intent to withdraw as an equity member of the Firm effective July 31. Def.'s SUMF ¶ 9; Moskowitz Decl., Ex. E. The notice advised that he expected to be paid $300,233, the value of his ABA as set forth in the Firm's last

4

year-end financial statement. The letter further advised that Moskowitz was not aware of any "events occurring" after January 1, 2013 that would permit adjustment of his ABA pursuant to Paragraph 3 of the 1997 Amendment. Moskowitz subsequently withdrew on July 31, Def.'s SUMF ¶ 9, and joined another D.C. law firm where he continued to represent "many of the same clients." Moskowitz Decl. ¶ 7; *see also* Jacobson Decl. ¶ 52 (stating that Moskowitz took more than 120 clients).

In total, six of the Firm's eight equity members withdrew as equity members.[1] Only Jacobson and Holman remained. Jacobson and Holman subsequently executed a new lease agreement with JBA on July 25 for the same space, commencing on August 1. Pl.'s SUMF ¶¶ 2, 8; Jacobson Decl. ¶ 35.

C.    The Firm's Calculation of Moskowitz's ABA

1.    *The 2012 Year-End Statement*

The Firm's outside accountants calculate and record the value of each equity member's ABA annually in the Firm's year-end statements. At all times relevant to this action, the accounting firm Gaffey Dean & Talley, PLC ("GDT") has served as the Firm's regularly employed outside accountants. Def.'s SUMF ¶ 7. On April 30, 2013, GDT completed its Independent Accountant's Review Report and Financial Statements for the Year Ended December 31, 2012 (the "2012 Year-End Statement"). *Id.* ¶ 8. The 2012 Year-End Statement listed Moskowitz's ABA as $300,233. Pl.'s SUMF ¶ 17.

---

[1]    One stayed on in an of counsel capacity.

2.     *The Restated 2012 Year-End Statement*

The Firm alleges that it subsequently discovered material errors in the 2012 Year-End Statement relating to member bonuses and allowances and asked GDT to review the statement.[2] GDT subsequently issued an Independent Accountant's Review Report and *Restated* Financial Statements for the Year Ended December 31, 2012 (the "2012 Restated Year-End Statement") in September.[3] Def.'s SUMF ¶ 10. The restated figures included previously unrecorded liabilities totaling $611,654 for unused portions of Business Expense Allowance ("BEA") accounts and bonuses due to Jacobson and several non-equity members. Pl.'s SUMF ¶ 19. In its report, GDT concluded that the failure to include these figures "resulted in a flawed accrual process as expenses were not properly matched to the related revenues." Def.'s Mtn. Summ. J., Ex. DX29 at 10. The effect was to reduce all of the equity members' ABA values. Moskowitz's ABA went from $300,233 to $222,602. Pl.'s SUMF ¶ 19.

It is undisputed that the Firm had not accrued bonuses and allowances as liabilities in prior years. *Id.* The Firm disputes this only to the extent "that the Firm's non-accrual of bonuses and allowances in prior years was [not] in any way determinative." Def.'s Opp'n at 6. In his declaration, Jacobson explained that the Firm's bonus structure changed in 2010 and that it was only then that bonuses and allowances became material and therefore should have been accounted for in the 2011 and 2012 year-end statements. Jacobson Decl. ¶ 46.

---

[2] In his declaration, GDT's managing member reported that it was not until late August that the Firm notified GDT of the possible errors in the previous report. Gaffey Decl. ¶ 6.

[3] The 2012 Restated Year-End Statement is dated "April 30, 2013 (except for Note 6, as to which the date is September 26, 2013)." Def.'s SUMF ¶ 10; Def.'s Mtn. Summ. J., Ex. DX29 at 2. Note 6 contains the restated values.

The Firm claims that, once it was issued, the 2012 Restated Year-End Statement superseded GDT's first statement. GDT relied on the 2012 Restated Year-End Statement to determine the value of Moskowitz's ABA as of December 31, 2012—his "base ABA." Moskowitz believes this was error and the only relevant financial statement to his ABA is the original 2012 Year-End Statement.

3.    *Adjustments for the Seven-Month Period Between December 31, 2012 and July 31, 2013*

The Firm directed GDT to prepare another financial statement to account for changes in the Firm's financials for the seven-month period between December 31, 2012 and the date of Moskowitz's withdrawal, July 31, 2013. In March 2014, GDT issued its Independent Accountant's Review Report and Financial Statements for the Seven-Month Period Ended July 31, 2013 (the "July 31 Statement"). Def.'s SUMF ¶ 11. This statement further reduced the amount of Moskowitz's ABA to $126,790. Pl.'s SUMF ¶ 21. The reduction was due, in part, to the Firm's decision to write off $550,514 in uncollectible accounts receivable and to accrue a $76,000 "ball park fee" for the years 2005 to 2013.[4]

According to Moskowitz, there was no decision made by the Firm's management prior to July 31, 2013 to write off the accounts receivable. As for the ball park fee, he claims the Firm

_____

[4] In the July 31 Statement, GDT explained the "ball park fee" as an obligation under the D.C. tax code applicable to "any person that derived at least $5 million in annual DC gross receipts and who was subject to any of the following at any given point during that person's preceding tax year ending on or before June 15 must file and pay the Form FR-1500, ball park fee: DC Corporation Franchise Tax, DC Unincorporated Business Franchise Tax, [or] [t]he DC Unemployment Compensation Act." Moskowitz Decl., Ex. L at 10–11 (bullet points omitted). GDT further stated, "Pending a final decision by the Firm as to the applicability of the ball park fee, fees for the years 2005-2013, amounts totaling $76,000 exclusive of interest and penalties, have been accrued." *Id.*

7

previously considered but ultimately decided not to pay the fee.  Moskowitz Decl. ¶ 22.  It is undisputed that the fee had not been accrued in the preceding eight years.

According to Jacobson, the Firm entered 2013 with uncollectible accounts receivable in excess of $600,000 due to the "conscious decision of the equity members not to write off these uncollectable accounts receivable because the members could not agree on who should assume the responsibility for the write offs."  Jacobson Decl. ¶ 32.  In fact, "[l]ittle or no write offs of accounts receivable of the Firm were recorded after 2010 for clients for whom an equity member was responsible," resulting in "a very high level of uncollectible accounts receivable, which also had the effect of inflating each equity member's Accrual Basis Account."  *Id.*  With respect to the ball park fee, Jacobson says the issue had been raised by GDT "almost every year, at least starting as early as 2010," but that the "equity members . . . determined to ignore the ballpark fee."  *Id.* ¶ 48.  He recalls that "[w]hen the issue was again raised by [GDT] in connection with the preparation of the July 31, 2013 financials, it was decided by the Firm that the ballpark fee should be accrued."  *Id.*

Notwithstanding Moskowitz's disagreement with the final number reached by GDT, the Firm believes Paragraph 24(A) of the Partnership Agreement requires that Moskowitz accept it.  Specifically, the Firm points to the language providing that the ABA "shall be established by the accountants regularly employed by the Partnership as soon as practicable after the effective date of such withdrawal and shall be conclusive and binding upon all Partners hereto."  Def.'s Mtn. Summ. J., Ex. DX1 at 16; Moskowitz Decl., Ex. H at 15–16.

    4.    *The Forfeiture and Assignment of Accounts Receivable*

When Moskowitz withdrew from the Firm, he continued to represent many of the same clients.  In response, the Firm invoked the forfeiture provision in Paragraph 1 of the 1997

Amendment and reduced Moskowitz's ABA payout by fifty percent, resulting in a total of $63,395.

Pursuant to Paragraph 3 of the 1997 Amendment, the Firm assigned Moskowitz $65,079.87 in accounts receivable to cover his ABA. Because the Firm believes it only owed Moskowitz $63,395, the Firm has counterclaimed for the overpayment of $1,684.87. Moskowitz does not dispute that it was proper for the Firm to assign accounts receivable to him to cover his ABA, but he disputes "at a minimum approximately $12,000 of [the amount assigned]." Pl.'s Mtn. Summ. J. at 2 n.1. Specifically, the complaint alleges that the Firm assigned him an $8,000 bill for services rendered after his departure and a $4,000 bill that had previously been written off. Compl. ¶ 24.

D.     Procedural History

    1.     *Complaint and Counterclaim*

On March 17, 2015, Moskowitz filed a complaint alleging two counts of breach of contract. (Dkt. No. 1). Count I alleges the Firm breached its contractual obligation to pay Moskowitz the full value of his ABA and Count II is directed at the propriety of the accounts receivable assigned to him. On May 4, 2015, the Firm filed its answer along with a six-count counterclaim against Moskowitz and other withdrawing equity members. Moskowitz filed a Motion to Dismiss or Sever the Permissive Counterclaims against the third-party defendants. (Dkt. No. 12). The Court granted the motion in part for lack of subject matter jurisdiction and severed the remaining counterclaims against the third-party defendants. *See Moskowitz v. Jacobson Holman, PLLC*, No. 1:15-CV-336, 2015 WL 4255100 (E.D. Va. July 13, 2015).

On August 10, 2015, the Firm filed an Amended Answer and Counterclaim. (Dkt. No. 34). The Counterclaim alleged two counts. Count I seeks a declaratory judgment that "the

adjustments made in the Accountant's Restated 12/31/12 JH Financial Statements and in the subsequent Accountant's 7/31/13 Financial Statements are correct and binding upon Moskowitz as of July 31, 2013." (Dkt. No. 34 at 14). Count II is a claim for monies owed. Specifically, the Firm alleges Moskowitz owes it $5,788.80 due to the fact that (1) the assignment of $65,079.87 of accounts receivable was an overpayment of $1,684.87 and (2) Moskowitz overdrew his BEA by $4,103.93.

2.    *Motion for Judgment on the Pleadings*

In his answer to the Firm's amended counterclaim, Moskowitz asserted as an affirmative defense that the Firm's forfeiture clause violates the District of Columbia Rules of Professional Conduct and is therefore void and unenforceable. (Dkt. No. 67). The Firm filed a motion for partial judgment on the pleadings directed at the legal sufficiency of this defense. (Dkt. No. 47). The Court denied the motion. *See Moskowitz v. Jacobson Holman, PLLC*, No. 1:15-cv-336, 2015 WL 6830266 (E.D. Va. Nov. 6, 2015).

3.    *Motions for Partial Summary Judgment*

Moskowitz and the Firm have each moved for partial summary judgment. In his motion, Moskowitz asks the Court to find that (1) the forfeiture provision is unenforceable; and (2) Moskowitz's ABA should be determined according to the 2012 Year-End Statement, not the 2012 Restated Year-End Statement or the July 31 Statement. (Dkt. Nos. 86, 88.)

In its motion, the Firm asks the Court to make six rulings: (1) the Firm's governing documents obligate the Firm to make adjustments to a withdrawn member's ABA for "events occurring in the period between the closing date of [the] last [annual] financial statement and [his or her] withdrawal date"; (2) the Partnership Agreement makes GDT's determination of Moskowitz's ABA "conclusive and binding" on him; (3) the Firm's governing documents do not

10

preclude or address the Firm's ability to instruct its accountants to issue the 2012 Restated Year-End Statement; (4) the 2012 Restated Year-End Statement is the "last annual financial statement" of the Firm; (5) the term "events" in the 1997 Amendment is defined by its common meaning; and (6) the adjustments in the July 31 Statement were proper because they are required by the Partnership Agreement or because they are "events" under the 1997 Amendment. (Dkt. Nos. 82, 83.) Both motions are opposed. The Court heard argument on January 15, 2016.

      4.     *Motion to Correct* Nunc Pro Tunc *Defendant's Opposition*

The Firm inadvertently failed to dispute a statement of fact in Moskowitz's motion for summary judgment. Upon realizing the mistake, the Firm filed a Motion to Correct *Nunc Pro Tunc* Defendant's Opposition. (Dkt. No. 95). The Firm presented argument on the motion at the summary judgment hearing. Finding good cause, the Court granted the motion.

      5.     *Other Pending Motions*

While the summary judgment motions were pending, Moskowitz filed a Motion to Strike the Defendant's Jury Demand on the Issue of the Enforceability of the Forfeiture Provision in the Operating Agreement (Dkt. No. 97) and a Motion *in Limine* to Preclude Any Testimony by the Defendant's Expert (Dkt. No. 99).

## II. ANALYSIS

A.    Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2010). "It is an axiom that in ruling on a

motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* (alteration omitted) (quoting *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam)) (internal quotation marks omitted).

B.    General Principles of Contract Interpretation Under D.C. Law

The parties agree that District of Columbia contract law governs this diversity action. D.C. "adheres to an 'objective' law of contracts, meaning 'the written language embodying the terms of an agreement will govern the rights and liabilities of the parties [regardless] of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or mutual mistake.'" *Dyer v. Bilaal*, 983 A.2d 349, 354 (D.C. 2009) (quoting *DSP Venture Grp., Inc. v. Allen*, 830 A.2d 850, 852 (D.C. 2003)).  To determine whether a contract is ambiguous, D.C. courts "examine the document on its face, giving the language used its plain meaning." *Id.* (quoting *Tillery v. D.C. Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C. 2006)).  "[C]ontracts are not rendered ambiguous by the mere fact that the parties do not agree upon their proper construction." *Id.* (quoting *Steele Founds., Inc. v. Clark Constr. Grp., Inc.*, 937 A.2d 148, 153 (D.C. 2007)).

A contract is ambiguous if it "has more than one reasonable interpretation." *Id.* (quoting *In re Bailey*, 883 A.2d 106, 118 (D.C. 2005)); *see also Tillery*, 912 A.2d at 1176 ("[A] contract is ambiguous when, and only when, it is, or the provisions in controversy are, reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings, and it is not ambiguous where the court can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends . . . ." (quoting *Burbridge v. Howard Univ.*, 305 A.2d 245, 247 (D.C. 1973)).  If the

court finds a contract ambiguous, "then the court—after admitting probative extrinsic evidence—must determine what a reasonable person in the position of the parties would have thought the disputed language meant." *Id.* (quoting *In re Bailey,* 883 A.2d 106, 118 (D.C. 2005)).

C.      The Calculation of Moskowitz's ABA

Although the Court is generally required to address cross-motions for summary judgment separately, *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011), both parties have asked the Court to apply D.C. contract law to the Firm's governing documents and determine the proper method for calculating Moskowitz's ABA as a matter of law. The arguments and counterarguments raised in the briefs with respect to this issue overlap completely. Therefore, the Court will consider the issue of contract interpretation of the governing documents one time.

As explained above, the Firm asks the Court to make six separate findings with respect to its calculation of Moskowitz's ABA on summary judgment. At bottom, however, the Firm asks the Court to find as a matter of law that its calculation of Moskowitz's ABA was correct—that is, it was proper to rely on the 2012 Restated Year-End Statement to determine Moskowitz's base ABA and then to adjust the base ABA as laid out in the July 31 Statement. Moskowitz in turn asks the Court to find that the 2012 Year-End Statement set his ABA and that none of the Firm's adjustments to that number were justified.

1.      *The Base ABA Figure*

Paragraph 3 of the 1997 Amendment provides that a withdrawing member's ABA "shall be that amount set forth in the last financial statement for the Company prepared by the Company's accountant, or the last monthly financial statement for the Company prepared by the Company's regularly employed bookkeeper, whichever is later, prior to the date of the

withdrawing Equity Member's notice of withdrawal, with adjustments to the withdrawal date solely for events occurring in the period between the closing date of such last financial statement and the withdrawal date." Def.'s Mtn. Summ. J., Ex. DX3 at 2–3. The parties disagree on the proper value of Moskowitz's base ABA—that is, the figure before any "adjustments to the withdrawal date" are made. Moskowitz contends it is $300,233 as stated in the 2012 Year-End Statement. The Firm contends it is $222,602 as stated in the 2012 Restated Year-End Statement.

The Firm does not have a regularly employed bookkeeper, so the relevant document is the "last financial statement . . . prepared by the Company's accountant . . . prior to the date of the withdrawing Equity Member's notice of withdrawal." *Id.* GDT issued the 2012 Year-End Statement on April 30, 2013, and Moskowitz gave his notice of withdrawal on June 28, 2013. No other statements were produced by GDT before June 28, 2013. The 2012 Restated Year-End statement was not issued until September 26, 2013—two months after Moskowitz withdrew and three months after his notice of withdrawal. Thus, under the clear terms of Paragraph 3, the 2012 Year-End Statement is the "last financial statement" and Moskowitz's ABA "shall be that amount set forth" in that statement—$300,233—absent the need for adjustments to the withdrawal date.

The Firm concedes that the 2012 Year-End Statement *was* properly considered the last financial statement, but argues that it was nullified and replaced when the 2012 Restated Year-End Statement issued. In the Firm's view, its decision to restate its financials after discovering material errors is not a contract-based right found in Paragraph 3. It is a decision vested in the broad discretion of Firm management. To hold that Paragraph 3 expressly or impliedly prohibits the Firm from doing so, the Firm submits, would result in the use of a flawed financial statement as the basis for calculating a withdrawing member's ABA. Finally, the Firm points out that

14

Moskowitz nowhere asserts that GDT's decision to accrue the bonuses and allowances in the restated financials was incorrect as a matter of accounting.

In response, Moskowitz does not dispute that it was within the Firm's discretion to restate its 2012 financials after his withdrawal. But he argues that Paragraph 3 limits the Firm's ability to use those restated financials to calculate a withdrawing member's ABA when it states the ABA "shall be that amount" in the "last financial statement" prepared before the notice of withdrawal. Moskowitz argues that Paragraph 3 does not provide for any adjustment to that figure except for events occurring between year-end and the date of withdrawal. Thus, in his view, even if the restatement was done for legitimate reasons, the base ABA figure is set in stone and the restatement is an improper basis on which to adjust that figure.

The Court agrees with Moskowitz that the clear language of Paragraph 3 requires that the amount of Moskowitz's base, year-end ABA "shall be" that amount set forth in the last financial statement before notice of withdrawal. The language is unequivocal. Paragraph 3 provides only one circumstance under which that number may be changed, and the inclusion of only one circumstance in which the ABA may be changed implies the exclusion of others.[5] Because the 2012 Year-End Statement is the "last financial statement" within the meaning of Paragraph 3, Moskowitz's ABA as of December 31, 2012 should properly have been considered to be $300,233.

For this reason, the Firm's additional argument that Paragraph 24(A) of the Partnership Agreement mandates that GDT's calculation of Moskowitz's ABA is "conclusive and binding" on him also fails. As the Firm concedes, this would only be true "as long as the Firm's

---

[5] The Firm has emphasized its, at times, turbulent past and the upheaval caused by prior departures of equity members. Yet, the Firm has never amended its governing documents to allow for post hoc revisions to its year-end financial statements. As such, the Court is bound by the clear and definite language in Paragraph 3.

Accountant's followed the method" prescribed by the Firm's governing documents, Def.'s Mtn. Summ. J. at 13, and the Court has just determined that they did not.

2.  *Adjustments for "Events Occurring"*

The next question is whether the Firm's adjustments to Moskowitz's ABA in the July 31 Statement to account for changes during the seven-month period between the last financial statement and the date of withdrawal were proper. As already noted, Paragraph 3 provides for "adjustments to the withdrawal date solely for events occurring in the period between the closing date of such last financial statement and the withdrawal date." Def.'s Mtn. Summ. J., Ex. DX3 at 3. The July 31 Statement made adjustments for routine changes in the Firm's finances during those months—such as present levels of cash and cash equivalents, client trust funds, income for that period, etc. The statement also included two more notable adjustments: a $76,000 accrual for the ball park fee for the years spanning 2005 to 2013 and the writing off of $550,514 of doubtful accounts receivable. Moskowitz argues that none of these changes are proper because they are not "events" within the meaning of Paragraph 3.

As a threshold matter, the parties disagree on the common and ordinary meaning of "events." Neither party asserts that their disagreement renders the term ambiguous, however, and the D.C. Court of Appeals has admonished that "a contract is not ambiguous merely because the parties disagree over its meaning." *Tillery*, 912 A.2d at 1177 (internal quotation marks omitted). The Firm argues that the plain meaning of "event" encompasses both routine and out-of-the-ordinary occurrences, as reflected by most dictionary definitions of the term. Thus, an event is both "something that happens; an occurrence" and "a noteworthy occurrence or

16

happening; something worthy of remark; an unusual or significant development."[6] Def.'s Mtn. Summ. J. at 17 (quoting Webster's Third New International Dictionary). Moskowitz contends that the context in which the term is used makes clear that Paragraph 3 is meant to account only for significant or noteworthy happenings beyond the normal course of business that impact the Firm's financials.

The Court agrees with the Firm that the plain and ordinary meaning of the word "events" as it is used in Paragraph 3 encompasses both routine changes to the Firm's finances as well as unusual or significant occurrences. First, "[i]t is a canon of contract interpretation that 'where language has a generally prevailing meaning, it is interpreted in accordance with that meaning.'" *1230-1250 Twenty-Third St. Condo. Unit Owners Assoc., Inc. v. Bolandz*, 978 A.2d 1188, 1191 (D.C. 2009) (quoting Restatement (Second) of Contracts § 202(3)(a) (1981)). The generally prevailing meaning of "events," as demonstrated by the Firm, includes both routine and noteworthy occurrences.

---

[6] The Firm also cites to opinions that rely on dictionary definitions in construing the word "event" in various other contexts. For example, in *Olympic Airways v. Husain*, the Supreme Court looked to dictionary definitions of "event" in deciding whether something was an "accident" within Warsaw Convention. 540 U.S. 644, 655 (2004) ("*See* American Heritage Dictionary 635 (3d ed. 1992) ('event': '[s]omething that takes place; an occurrence'); Black's Law Dictionary 554–555 (6th ed. 1990) ('event': 'Something that happens'); Webster's New International Dictionary 885 (2d ed. 1949) ('event': 'The fact of taking place or occurring; occurrence' or '[t]hat which comes, arrives, or happens').") And in *Abraham v. St. Croix Renaissance Group, L.L.L.P.*, the Third Circuit examined dictionary definitions of "event" to determine its ordinary meaning in the context of the Class Action Fairness Statute. 719 F.3d 270, 277 & n.6 (3d Cir. 2013) (citing definitions in the American Heritage Dictionary and Merriam-Webster's as "something that takes place, especially a significant occurrence" and "something that happens," "occurrence," and "a noteworthy happening"); *accord Allen v. Boeing Co.*, 784 F.3d 625, 630–31 (9th Cir. 2015) (relying on the dictionary definitions); *Rainbow Gun Club, Inc. v. Denbury Onshore, L.L.C.*, 2014 U.S. App. LEXIS 14076, at *9 (5th Cir. 2014) (same).

Second, when the term is viewed in the context of the agreement as a whole, it is clear that "events" cannot be as limited as Moskowitz suggests. As a general matter, the purpose of Paragraph 3 is to provide a procedure to determine the value of the withdrawing equity member's interest as of the date of withdrawal. It does so using the last year-end statement followed by "adjustments to the withdrawal date." It is reasonable to assume that the same metrics as were used in reaching the year-end figure would be used to account for the additional months of the withdrawing member's tenure at the Firm. Certainly, Paragraph 3's predecessor calculation model in Paragraph 24(A) of the Partnership Agreement made adjustments to the ABA for routine changes to the Firm's financial position. *See* Def.'s Mtn. Summ. J., Ex. DX1 at 16 (providing for adjustment to account for "Net Profits (and Losses) and Accrual Basis Profits (or Losses) allocable to such Partner up to date of withdrawal"). As the Firm points out, a contrary practice would mean that a member who withdraws mid-year may receive a windfall if the Firm's business significantly declines during the intervening months or may lose a significant benefit if the Firm's performance improves.

The Firm also points to the fact that the "events occurring" provision is bookended by a caveat: "provided, however, that there shall be no adjustment to the withdrawing Equity Member's Accrual Basis Account with respect to any payments for rent due under the new lease after the Equity Member withdrawal date." Because lease payments can only be considered a routine event, the need to explicitly exclude future rent payments from the adjustments made to the ABA indicates that "events" covers the Firm's routine financial activities. Thus, the Court concludes that the plain and unambiguous meaning of "events" include those occurrences both routine and significant during the relevant time period.

18

That conclusion does not, however, assist the Firm in justifying the accounts receivable or the ball park fee. Paragraph 3 places an explicit temporal limitation on when the relevant events must occur—that is, "solely" events occurring "in the period between the closing date of such last financial statement and the withdrawal date."[7] It is undisputed that the uncollectible accounts receivable and the ball park fee existed before December 31, 2012. Thus, Moskowitz argues that under any definition of "events," these adjustments were improper.

The Firm responds in two parts to the adjustment made for the doubtful accounts receivable. First, Paragraph 24(A) requires writing off doubtful accounts receivable and nothing in Paragraph 3 modified that requirement. Second, even if a triggering event is required, the withdrawal of six of eight equity members is a significant event that occurred during the relevant time period that would justify writing off uncollectible accounts receivable.

The Court agrees that Paragraph 24(A) provided the Firm an independent basis for the adjustment to its accounts receivable. The last sentence of Paragraph 24(A) instructs: "In establishing such adjusted Accrual Basis Account, the accountant *shall* include a reduction for doubtful accounts, based upon prior experience of the Partnership." Def.'s Mtn. Summ. J., Ex. DX1 at 16 (emphasis added). This is exactly what the July 31 Statement did.

Moskowitz never directly addresses the Firm's Paragraph 24(A) argument, though there is a more general disagreement throughout the briefing about how much of Paragraph 24(A) survived the 1997 Amendment. It is clear that the first two sentences of Paragraph 24(A), which set a method for calculating a withdrawing member's ABA, are inconsistent with Paragraph 3

---

[7] At various points in its briefing, the Firm alludes to the fact that the definition of "events" has no temporal limit. *See, e.g.*, Def.'s Mtn. Summ. J. at 5 (stating common and ordinary meaning of events is "not necessarily confined to a discrete moment in time"). Whether that may be the case in other contexts, Paragraph 3 provides an explicit temporal limitation on when the relevant event must have occurred.

and therefore Paragraph 3 controls.[8]   The Court can identify no inconsistency, however, between

Paragraph 3 and the last sentence of Paragraph 24(A) regarding doubtful accounts receivable.

Thus, that instruction remains in force and there is no need for the Firm to tie the doubtful

accounts receivable to an event occurring during the relevant time period.

There is no similar proviso that would cover the Firm's decision to accrue eight years'

worth of ball park fees in the July 31 Statement.  The parties' briefing on the ball park fee is

sparse.  Moskowitz only briefly alludes to the fee and the Firm not at all.  Accordingly, the Court

finds genuine issues of material fact relating to the accrual of the ball park fee preclude summary

judgment on the propriety of that adjustment.

In sum, the Court finds Moskowitz's base ABA should have been set by the 2012 Year-

End Statement, which is the "last financial statement" within the meaning of Paragraph 3.  With

respect to the July 31 Statement, the Court concludes: (1) the adjustments to Moskowitz's year-

end ABA for routine changes in the Firm's finances during the seven-month period preceding his

withdrawal were properly considered "events occurring" and thus properly included in the July

31 Statement; (2) Paragraph 24(A) provides an independent basis for the Firm's decision to write

off doubtful accounts receivable; and (3) issues of material fact remain with respect to the

accrual of the ball park fee.

D.     The Forfeiture-for-Competition Provision

As explained above, Paragraph 1 of the 1997 Amendment provides that a withdrawing

equity member who "takes client(s) . . . will forfeit and give up to the Company fifty percent

(50%) of his/her Accrual Basis Account."  Def.'s Mtn. Summ. J., Ex. DX3 at 1.  When

---

[8]   As explained above, the Firm's Operating Agreement incorporated the Partnership
Agreement "except to the extent that any provision of the Partnership Agreement is inconsistent
with . . . [the Operating Agreement]."

Moskowitz withdrew, many of his clients followed him. In response, the Firm invoked Paragraph 1 and cut his ABA payout in half. Moskowitz now moves for summary judgment as to the enforceability of Paragraph 1.

Specifically, he argues the provision violates D.C. Rule of Professional Conduct 5.6(a) and is void as contrary to public policy.[9] In response, the Firm argues that genuine issues of material fact remain as to whether Paragraph 1 violates Rule 5.6.

D.C. Rule of Professional Conduct 5.6, titled "Restrictions on Right to Practice," prohibits lawyers from "partipat[ing] in offering or making . . . [a] partnership, shareholders, operating, employment or other similar type of agreement that restricts the right of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement." D.C. R. Prof'l Conduct 5.6(a) (2007). The rule serves the dual purposes of protecting attorneys' professional autonomy and "the freedom of clients to choose a lawyer." *Id.* cmt. 1; *see also Neuman v. Akman*, 715 A.2d 127, 130–31 (D.C. 1998) (explaining the interests underlying the rule).

This is not the first time in this litigation that the Court has faced Rule 5.6's application to this case. The Firm previously filed a motion for partial judgment on the pleadings directed at Moskowitz's reliance on Rule 5.6 as an affirmative defense. The motion presented only a limited question, however: whether, under D.C. law, a finding that Paragraph 1 violated Rule 5.6 would render the provision unenforceable as a matter of contract law. The question of enforceability has not yet been addressed by the D.C. Court of Appeals, and courts in other jurisdictions have not universally held that contract provisions that violate Rule 5.6 are

---

[9] Moskowitz alternatively argues that the provision is inapplicable to him by its terms. Because the Court concludes Paragraph 1 is unenforceable, the Court need not reach this additional ground.

unenforceable. Ultimately, the Court was convinced that D.C. will join the majority view and hold that a contract provision that violates Rule 5.6 is unenforceable as contrary to public policy.

Although the Court's earlier holding was limited, the Court also explained that the scope of Rule 5.6's prohibition against agreements that "restrict[] the right of a lawyer to practice" presents an issue of first impression in D.C. The Court indicated that, if faced with the question, it would again predict that the D.C. Court of Appeals would adopt the majority view that Rule 5.6 prohibits not only outright restrictions on practice, but also indirect restraints, such as financial disincentives. *See Moskowitz*, 2015 WL 6830266, at *4 ("Several things would support a prediction that the D.C. Court of Appeals will join the majority view. . . . It is not necessary at this juncture in the litigation for this Court to predict how the D.C. Court of Appeals will interpret the scope of Rule 5.6, however, because the Firm concedes for purposes of its motion that the forfeiture provision violates the rule."). The Court now faces the issue directly.

The last opinion from the D.C. Court of Appeals to substantively address Rule 5.6 was *Neuman v. Ackman*, 715 A.2d 127. There, the court reached only the rule's "benefits upon retirement" exception. In a footnote, however, the court observed the split in authority regarding what constitutes a restriction on practice, noting that "courts have often invalidated various types of financial disincentives as indirect restraints on the practice of law, finding them sufficiently opprobrious to be barred by the ethical rule." *Id.* at 132 n.8 (collecting cases). The court also cited the minority view that "[a]n agreement that assesses a reasonable cost against a partner who chooses to compete with his or her former partners does not restrict the practice of law." *Id.* (quoting *Howard v. Babcock*, 863 P.2d 150, 156 (Cal. 1993)). This footnote is the D.C. Court of Appeals' last word on the issue.

*Neuman* was decided in 1998. In 2006, Comment 2 was added to D.C.'s Rule 5.6. It clarified that "[r]estrictions, other than those concerning retirement benefits, that impose a substantial financial penalty on a lawyer who competes after leaving the firm may violate paragraph (a)." D.C. R. Prof'l Conduct 5.6 cmt. 2. D.C. ethics opinions likewise have interpreted Rule 5.6 to follow the majority rule (both before and after the addition of Comment 2). *See, e.g.*, D.C. Legal Ethics Op. 368 (2015) ("The prohibition extends not only to absolute bars upon competition with the former firm but also, at least in some circumstances, to restrictions that impose a substantial financial penalty on a lawyer who competes after leaving the firm." (internal quotations, alteration, and ellipsis omitted)); *id.* at n.7 (citing the rule in *Howard* as "distinctly the minority rule"); D.C. Legal Ethics Op. 325 (2004) ("It has long been clear that Rule 5.6(a) bars not only agreements that would explicitly restrict lawyers' practices but also reaches those agreements that may not explicitly bar such actions but create financial disincentives to taking those actions."). Thus, the Court predicts that in line with Comment 2 to Rule 5.6, the construction of the rule given to it by the D.C. Bar Ethics Committee, and the majority of its sister jurisdictions, the D.C. Court of Appeals will hold that indirect restraints fall within Rule 5.6's prohibition. *Cf. Shainis v. Baraff, Koerner, Olender & Hochberg, P.C.*, No. 93-2253, 1994 U.S. Dist. LEXIS 21971 (D.D.C. July 18, 1994) (making the same prediction).

The only question remaining, then, is whether Paragraph1 violates Rule 5.6. It is undisputed that Paragraph 1 does not on its face impose a direct restriction on a withdrawing member's right to practice following departure from the Firm. Instead, it attaches a financial cost to a withdrawing member's decision to continue to represent any of his or her clients. For that to amount to an impermissible restriction, the penalty must be "substantial" and the penalty

23

must be imposed upon "lawyer[s] who compete[] after leaving the firm." D.C. R. Prof'l Conduct 5.6 cmt. 2. If both conditions are met, the restriction "may violate" Rule 5.6. *Id.*

The Court first finds that there can be no dispute as to whether Paragraph 1 is directed at lawyers "who compete[] after leaving the firm."[10] *Id.* Under the Firm's governing documents, all withdrawing equity members are entitled to the value of their partnership interest (or ABA) with only one exception. If a withdrawing equity member takes "client(s)," he or she forfeits fifty percent of an otherwise-accrued equity interest. Under *any* other circumstance, a withdrawing member will receive the full value of his or her ABA.

The Firm does not seriously dispute that fact. Instead, the Firm argues that the penalty imposed is not substantial and thus does not trigger the application of Rule 5.6. The Firm correctly notes that Rule 5.6 does not provide a bright-line standard with which to determine when a penalty crosses from insubstantial to substantial. D.C. Rule of Professional Conduct 1.0 does, however, define "substantial." It explains that, "when used in reference to degree or extent," the word "denotes a material matter of clear and weighty importance." D.C. R. Prof'l Conduct 1.0(m). The Court finds that a fifty-percent forfeiture of a withdrawing member's equity interest in the Firm is a financial penalty "of clear and weighty importance." Here, the possible amounts of Moskowitz's forfeiture ranged from $63,395 at its lowest to $150,116 at its highest.

---

[10] Comment 2's requirement that the restriction be directed at attorneys who leave and compete is in line with the Restatement view that where the denial of "otherwise-accrued financial benefits . . . applies to all departing firm lawyers, whether entering into competitive practice or not," it does not violate the rule. Restatement (Third) of the Law Governing Lawyers § 13 cmt. b; *see e.g.*, *Pierce v. Morrison Mahoney LLP*, 897 N.E.2d 562, 569 (Mass. 2008) (holding that where a partner who withdraws and competes is faced with the same financial consequences as a partner who withdraws but does not compete, the partner is no longer faced with the same "problematic" choice).

The Firm disagrees. It submits that a penalty is substantial only if it is larger than reasonably required to achieve the otherwise valid business objectives of the Firm. In support, the Firm cites *Pettingell v. Morrison, Mahoney & Miller*, 687 N.E.2d 1237 (Mass. 1997). In *Pettingell*, the Massachusetts Supreme Court "recognize[d] a limited exception to the general policy in favor of client choice where the actions of a former partner would jeopardize a firm's legitimate interest in survival, thus shrinking the available market of attorneys."[11] *Eisenstein v. David G. Conlin P.C.*, 827 N.E.2d 686, 691 n.14 (Mass. 2005) (explaining the holding of *Pettingell*). Even assuming for a moment that D.C. adopts a similar exception, there is no evidence in the summary judgment record that suggests Moskowitz's withdrawal would fit within such an exception. The Firm explains that the intent behind the forfeiture provision was to offset the decrease in revenue caused by the withdrawing member against the Firm's remaining lease obligations.[12] It is undisputed, however, that the date of Moskowitz's

---

[11] The Firm also cites *Capozzi v. Latsha & Capozzi, P.C.*, 797 A.2d 314 (Pa. Super. Ct. 2002) and *Gray v. Notebloom*, 159 S.W.3d 750 (Tex. App. 2005), but those cases are inapposite given the Court's earlier holding. In *Capozzi*, the court followed the minority view espoused in *Howard v. Babcock* and held that an indirect restriction on the practice of law must be assessed under the reasonableness standard applied to all non-compete clauses. In *Gray*, the court enforced a provision despite concluding that it violated Texas ethics rules because it believed sufficient justifications existed for the penalty. *Cf.* Jennifer Turner, Noteboom: A Dramatic Deviation from Texas' Stand Against Non-Competition Clauses Among Lawyers, 58 Baylor L. Rev. 1011 (2006) (describing the decision as "surprising not only because it goes against the majority of other states, Ethics Opinion 459, and Texas jurisprudence regarding these restrictive covenants, but also because it does not address the principal policy reason against enforcing these agreements: to protect clients' ability to choose their attorney"). The Court has already predicted that the D.C. Court of Appeals will assess the enforceability of forfeiture-for-competition clauses under the public policy set by Rule 5.6 and not the general reasonableness analysis adopted by a minority of jurisdictions.

[12] In fact, the Firm directs the Court to the report of its purported expert, James W. Jones, Esq. *See* Def.'s Opp'n at 10 (citing Jones Decl., Ex. 1 at 5–9, 18). The report contains a lengthy recitation of the Firm's history leading up to the adoption of the 1997 Amendment and ends with Mr. Jones's conclusion that the purpose of the forfeiture provision was to protect the Firm from buckling under its lease obligations.

withdrawal coincided with the last day of the Firm's lease agreement. Moreover, the Firm was on notice of Moskowitz's withdrawal at the time it entered into a new lease agreement for the same office space. Thus, there is no genuine issue of material fact as to whether the Firm's invocation of the forfeiture provision against Moskowitz was due to a legitimate interest in its own survival. The Massachusetts Supreme Court has also noted that even where a firm can justify a penalty on survival grounds, firms that apply that penalty only to withdrawing partners who compete face a steeper challenge. *See Pettingell*, 687 N.E.2d at 258.

The Firm also argues that the penalty cannot be substantial because it is a fraction of Moskowitz's current salary at his new firm. Notably, the Firm does not cite any authority supporting the use of a lawyer's current salary as a benchmark in determining whether a penalty is substantial. Nor has the Court uncovered any.

Because Paragraph 1 imposes a substantial penalty against lawyers who leave the Firm and compete, the provision violates Rule 5.6 if it restricts the right to practice. D.C. ethics opinions have recognized that "the simple existence of an economic cost to leave a firm" does not violate the rule unless it also has the effect of creating "a restriction on competition or other limitation on practice." D.C. Bar. Op. No. 325 (2004). As an example of when a financial disincentive may not have the requisite effect, the D.C. Bar Committee points to a 1991 decision addressing contingency fee clients. D.C. Bar Op. No. 221 (1991). The agreement at issue provided that if a lawyer withdrew and took a contingency fee client, a portion of the fee must be paid back to the former firm. The Committee concluded that a percentage formula that represented a fair allocation of fees attributable to the work completed while the attorney was at the former firm would not violate the rule, but that if the firm's share was excessive, it would have the effect of restricting the departing lawyer's right to practice. In "contrast" to the

contingency fee scenario, the Committee has distinguished scenarios in which "an agreement impos[es] substantial damages—actual or liquidated—attributable to or because of work done by the departing lawyer (or her new firm) in competition with the former firm *after* she relocates." D.C. Bar Op. No. 368 (2015).

The Court finds the Firm's forfeiture provision is more akin to the latter scenario. Withdrawing members are subject to the forfeiture because of work done on behalf of the Firm's former clients after relocation. The Firm admits as much. In its opposition, the Firm cites a paragraph in Jacobson's declaration that asserts the penalty was reasonable because (1) the Firm invested more than $1 million in "Moskowitz's practice," (2) the Firm's former clients have generated more than $1.2 million for Moskowitz's new firm in the two years since he relocated, and (3) Moskowitz has increased his annual earnings by $64,000 at his new firm. Def.'s Opp'n at 10 n.7 (quoting Jacobson Decl. ¶ 52). The first ground is nominally tied to Moskowitz's time at the Firm, but notably the Firm only cares to recoup its investment in the sole instance that the attorney leaves and continues to represent one or more clients. The last two reasons are linked solely to the work done by Moskowitz following his relocation.

Moreover, the practical effect of the Firm's forfeiture clause is to penalize withdrawing members who wish to continue to represent even one of the Firm's clients by depriving them of a previously accrued equity interest to which they would otherwise be entitled. When Moskowitz left the Firm, he faced a choice: receive the full value of his ABA and turn down his clients who sought his continued representation, or forfeit fifty percent of his equity interest in the Firm and continue to represent his clients' interests. There is a clear disincentive attached to the latter option. Lawyers facing that choice may be deterred or discouraged from continuing to represent former clients because to do so requires sustaining a substantial financial penalty. It is that

27

disincentive that risks limiting client choice of counsel and renders Paragraph 1 an impermissible restriction on the right to practice. The Court does not doubt the Firm when it says the intent behind Paragraph 1 was not anticompetitive but was instead due to an honest concern over future rent obligations. But whatever the intent, the practical effect of the provision remains the same.

The Firm's final defense is that because Moskowitz was able to withdraw, endure the penalty, and continue to represent his clients, Paragraph 1 cannot be said to have restricted his practice. The court in *Pettingell* rejected a similar argument, explaining:

> The objective of [Rule 5.6] is to permit a lawyer who leaves a law firm to act for clients of the law firm without being discouraged from doing so by a provision for the forfeiture of funds. A forfeiture provision tends to discourage client free choice by encouraging a lawyer who leaves a firm not to compete. The broad prophylactic object of [Rule 5.6] is to forbid the inclusion of such a provision in all partnership agreements. The fact that clients in this case may have had free choice of counsel does not justify the enforcement of the forfeiture provision.

*Pettingell*, 687 N.E.2d at 1240; *see also Cohen v. Lord, Day & Lord*, 550 N.E.2d 95, 98 (N.Y. 1989) ("The forfeiture-for-competition provision would functionally and realistically discourage and foreclose a withdrawing partner from serving clients who might wish to continue to be represented by the withdrawing lawyer and would thus interfere with the client's choice of counsel."); *Anderson v. Aspelmeier, Fisch, Power, Warner & Engberg*, 461 N.W.2d 598, 602 (Iowa 1990) ("Faced with a choice of taking a share of the firm's profits or some of its clients, a partner may well choose the former if it yields a net economic benefit. In that case, the client's freedom of choice has been bargained away just as effectively as if the partnership agreement contained a bald restrictive covenant." (quoting R. Hillman, Law Firm Breakups 32 (1990)).

Because Paragraph 1 imposes a clear disincentive to the continuing relationship between a withdrawing attorney and clients, it is a restriction on practice within the meaning of Rule 5.6. Because Paragraph 1 violates Rule 5.6, it is unenforceable as a matter of law, and Moskowitz is

entitled to partial summary judgment on that ground. This ruling also has the effect of rendering Moskowitz's later-filed Motion to Strike the Defendant's Jury Demand on the Issue of the Enforceability of the Forfeiture Provision in the Operating Agreement (Dkt. No. 97) and Motion *in Limine* to Preclude Any Testimony by the Defendant's Expert (Dkt. No. 99) moot.

### III. CONCLUSION

For the foregoing reasons, Moskowitz's Motion for Partial Summary Judgment (Dkt. No. 86) is GRANTED IN PART and DENIED IN PART, and the Firm's Motion for Partial Summary Judgment (Dkt. No. 82) is GRANTED IN PART and DENIED IN PART. The Firm's Motion to Correct *Nunc Pro Tunc* Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 95) is GRANTED. Moskowitz's Motion to Strike the Defendant's Jury Demand on the Issue of the Enforceability of the Forfeiture Provision in the Operating Agreement (Dkt. No. 97) and Motion *in Limine* to Preclude Any Testimony by the Defendant's Expert (Dkt. No. 99) are DISMISSED AS MOOT. An appropriate order shall issue.

January 28, 2016
Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge

29